[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
I. ACTUAL BACKGROUND
Ronald McKosky and Alton Seavey were business partners for many years. Unhappily, their relationship soured, and they have decided to spend their golden years suing each other. This lawsuit, tried to the court, features three causes of action asserted against Seavey by McKosky, six causes of action asserted against McKosky by Seavey, and numerous special defenses asserted by each against the other's causes of action.
A brief description of the relatively undisputed factual background will be helpful before the causes of action are considered in detail. McKosky and Seavey were originally equal shareholders of a corporation entitled Plastech Corporation (not, as will be seen, the Plastech Corporation named as a party here), a company manufacturing molded plastic parts. This corporation will be referred to as "Plastech I." Plastech I was incorporated in 1967. McKosky was the president and treasurer and in charge of administration. Seavey was the vice president and secretary and in charge of marketing. McKosky and Seavey were also partners in a real estate investment firm entitled Investment Associates. Investment Associates owned the building and grounds on which Plastech I CT Page 7548 conducted its business.
In 1988, McKosky decided to retire. Plastech I sold its assets to a purchaser entitled Summit Associates, Inc. ("Summit"). Summit financed the deal with a substantial loan from the Branford Savings Bank (the "Bank"). Plastech I was dissolved in 1989. Investment Associates still owned the building and grounds and leased them to Summit.
In May 1990, the building was severely damaged by a fire. One of Summit's partners (not a party to this litigation) was eventually convicted of arson in connection with that fire. The Bank took over the business. In 1991, Seavey acquired the business (along with its considerable debt) from the Bank. He formed a new corporation, also entitled Plastech Corporation. (The new corporation, which is the named defendant in this case, will simply be referred to as "Plastech.") Seavey is the sole owner of Plastech. Plastech conducted the business formerly conducted by Plastech I and Summit and continued to lease the building and grounds from Investment Associates. On March 4, 1992, Plastech signed a lease with Investment Associates, agreeing to rent the building and grounds for the sum of $8,125 per month.
In March 1992, Seavey and McKosky had a conversation in an automobile while traveling on I-95. Seavey told McKosky that Plastech had serious financial problems and asked McKosky if he would be willing to help. Seavey additionally told McKosky that he (Seavey) would not be able to pay McKosky for his services. McKosky volunteered his services. McKosky thereafter devoted considerable time to straightening out Plastech's finances. After an initial flurry of intense activity, McKosky devoted approximately fifty hours a month to working on Plastech's financial affairs.
On April 2, 1992, Investment Associates commenced an action against Aetna Casualty Surety Company of Illinois. Investment Associates v.Aetna Casualty Surety Co., No. 330796 (N.H.J.D.). Investment Associates claimed that it should have been named as an insured on an Aetna policy insuring its building (which, it will be recalled, had been damaged by fire) and that Aetna had refused to reform the policy. McKosky acted as Investment Associates' "point man" in pursuing this claim.
On November 23, 1993, Seavey sold his 50% share of Investment Associates to McKosky's wife, Tatjana McKosky, for the sum of $350,000. On the same day, Plastech signed a new lease with Investment Associates, agreeing to rent the building and grounds for $6,000 per month. Investment Associates' lawsuit against Aetna was still pending.
In March 1994, Investment Associates (now controlled by the McKoskys) CT Page 7549 settled its case against Aetna for the sum of $150,000. The action was withdrawn on April 14, 1994. Seavey learned of this event at some point in 1994.
Plastech began to show a profit in 1994, although it remained deeply in debt. McKosky asked Seavey to provide him with medical benefits. This was done. McKosky did not ask for any additional compensation.
By January 1998, Plastech had become more profitable, and much of its debt had been paid off. McKosky asked Seavey for a salary to be paid from that date forward. McKosky and Seavey agreed that McKosky would be paid a salary of $1,500 per month, commencing immediately. The salary was paid accordingly.
On February 4, 1999, Plastech signed a two-year lease with Investment Associates, commencing January 1, 1999, agreeing to rent the building and grounds for the sum of $7,500 per month.
At some point in February 1999, Seavey told McKosky that his (McKosky's) services were no longer required. McKosky left Plastech's employment immediately.
At about this time, Seavey was actively seeking a purchaser to buy Plastech. On March 1, 1999, one Ronald Malloy proposed to purchase the business for $600,000. Malloy's letter of that date did not specify a closing date, but included a proposal that Plastech not discuss a sale with any third party until either the closing or April 15, 1999, whichever shall first occur. This transaction was never consummated.
On March 29, 1999, McKosky sent Plastech a one-page "Invoice." This singular document states that the sum of $112,500 is "due on receipt" for "accounting services" performed during the calendar years 1991 through 1997 at the rate of $1,500 per month. $4,500 is billed for the calendar year 1991, and $18,000 is billed for each calendar year thereafter. The Invoice provides no further details.
On April 29, 1999, McKosky wrote to Malloy's attorney, Gerald Fox, Jr., proposing a rent of $8,500 per month for the building and grounds owned by Investment Associates.
On May 12, 1999, McKosky commenced this action by service of process. Plastech was the sole original defendant. (Seavey was added as a party defendant later.) Earlier, on May 7, 1999, McKosky filed an application for prejudgment remedy and temporary restraining order in this court. The application seeks an attachment of Plastech's assets in the amount of $12,000 and an order precluding Plastech from selling its assets. On June CT Page 7550 15, 1999, following a hearing, the application was denied by the court (DeMayo, J.).
On May 13, 1999, Malloy wrote to McKosky stating that he had received bank approval to close on the Purchase of Plastech on May 25, 1999 and requesting certain building repairs. As mentioned, the proposed deal was never consummated. The reasons for its failure cannot be determined from the credible evidence.
In 2000, Seavey sold many of Plastech's assets to Putnam Precision Molding, Inc. ("Putnam"). Seavey retained ownership of some molding machines which he is attempting to sell separately. Putnam now conducts Plastech's former business from its (Putnam's) own premises. Investment Associates subsequently sold the building and grounds to ZFI Group LLC. Only the litigation remains.
II. THE PLEADINGS
McKosky's Second Amended Complaint consists of three counts. Count I seeks payment of a minimum fair wage pursuant to Conn. Gen. Stat. §31-60(a) "for the period of October, 1991 through December 31, 1997." Count II alleges "an implied agreement" between the parties "that the Plaintiff would be compensated for his services." Count III alleges unjust enrichment.
Plastech asserts a special defense that McKosky's "claims, if any, are barred by the applicable statute of limitations namely, Conn. Gen. Stat.52-596, 52-581 and/or 52-576 and/or laches."
Plastech's counterclaim (no counterclaim is asserted by Seavey) consists of six counts. The First Count alleges tortious interference with Plastech's contract with Malloy and with Plastech's "business expectancies." It specifically alleges that McKosky unreasonably refused to consent to a "lease assignment" and also filed this action "solely for the purpose of interfering with the sale of Plastech Corporation." The Second Count alleges that the conduct complained of in the First Count violated the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a, et seq. The Third Count alleges conversion. It specifically alleges that in March 1998, McKosky converted a check in the amount of $4,500 "to his own use." Plastech abandoned this count in its posttrial brief. The Fourth Count alleges that the application for prejudgment remedy filed in this case constituted an abuse of process. The Fifth Count alleges that an Amended Complaint filed by McKosky in this action on February 3, 2000, constitutes malicious prosecution. The Sixth Count alleges breach of fiduciary duty. It specifically alleges that McKosky purchased Seavey's interest in Investment Associates on November CT Page 7551 23, 1993, without disclosing "the ongoing settlement discussions by and between Investment Associates and Aetna."
McKosky asserts five special defenses, all of them directed to the Fifth And Sixth Counts. As to the Fifth Count, McKosky asserts that the prosecution complained of has not terminated in favor of the claiming party. As to the Sixth Count, McKosky asserts that: (1) Plastech has failed to assert factual allegations sufficient to establish a claim for breach of fiduciary duty, (2) the claim is "barred by the applicable statute of limitations," (3) the damages complained of were the result of Seavey's negligence, and (4) McKosky had no fiduciary duty.
The action was tried to the court on April 27 and 30, 2001. Following posttrial briefing, it was argued on June 12, 2001. The various causes of action must now be considered in turn.
III. DISCUSSION
A. McKosky's claims
1. Count I
Count I of McKosky's Second Amended Complaint seeks payment of a minimum fair wage pursuant to Conn. Gen. Stat. § 31-60(a) "for the period of October, 1991 through December 31, 1997." It is undisputed that Plastech permitted McKosky to work for it from approximately March 1992 through December 31, 1997. (McKosky, on the stand, disavowed any claim for work performed prior to March 1992.) It is also undisputed that, while McKosky received medical benefits during the latter part of this period (the parties dispute the date on which medical benefits commenced), he received no monetary compensation whatsoever during this period. Although this arrangement was, at the time, a voluntary one, Connecticut's statutes governing minimum wages do not permit it.
Conn. Gen. Stat. § 31-60(a) provides that, "Any employer who pays or agrees to pay an employee less than the minimum fair wage or overtime wage shall be deemed in violation of the provisions of this part. The terms "employer," "employee," and "minimum fair wage" are all statutorily defined.
An "employer" means "any owner or any person, partnership, corporation, limited liability company or association of persons acting directly as, or in behalf of, or in the interest of an employer in relation to employees." Conn. Gen. Stat. § 31-58(e). Assuming arguendo that McKosky was an "employee" (a question that shall be visited in a moment), Plastech was plainly his "employer." CT Page 7552
The question of whether McKosky was an "employee" is somewhat more complex. Conn. Gen. Stat. § 31-58(f) provides that:
 "Employee" means any individual employed or permitted to work by an employer but shall not include any individual employed in camps or resorts which are open no more than six months of the year or in domestic service in or about a private home, except any individual in domestic service employment as defined in the regulations of the federal Fair Labor Standards Act, or an individual employed in a bona fide executive, administrative or professional capacity as defined in the regulations of the Labor Commissioner or an individual employed by the federal government, or any individual engaged in the activities of an educational, charitable, religious, scientific, historical, literary or nonprofit organization where the employer-employee relationship does not, in fact, exist or where the service rendered to such organizations are on a voluntary basis, or any individual employed as a head resident or resident assistant by a college or university, or any individual engaged in baby sitting, or an outside salesman as defined in the regulations of the federal Fair Labor Standards Act; or any individual employed by a nonprofit theater, provided such theater does not operate for more than seven months in any calendar year.
McKosky was plainly "permitted to work" by Plastech. The only question is whether any of the statutory exemptions or exclusions apply. These exemptions or exclusions are to be "strictly and narrowly construed. . . . The burden rests on the employer to establish that his employees come within an exception." Shell Oil Co. v. Ricciuti, 147 Conn. 277, 283,160 A.2d 257 (1960). Plastech has not carried this burden. The only possible question in this regard is whether McKosky was "employed in a bona fide executive, administrative or professional capacity as defined in the regulations of the Labor Commissioner." The regulations referred to make it clear that he was not so employed. A person employed in such a capacity must, inter alia, be "compensated for his services on a salary basis." Conn. Agencies Regs. §§ 31-60-14(f), 31-60-15(e)(1) 31-60-16(e). It is undisputed that McKosky received no salary during the period in question. He was, consequently, an "employee."
As an "employee," McKosky was entitled to receive a "minimum fair CT Page 7553 wage." Conn. Gen. Stat. § 31-58(j) provides that, "Minimum fair wage" in any industry or occupation in this state means a wage of . . . effective October 1, 1988, not less than four dollars and twenty-five cents per hour." (The minimum fair wage was increased after the period of employment involved here.) McKosky was thus entitled to a minimum fair wage of $4.25 per hour during the period in question. Although he claims a greater sum, the legislature has specified the "minimum fair wage" "in any industry or occupation in this state." The legislative determination is controlling here.
The period of time for which McKosky must receive a minimum fair wage must now be considered. Conn. Gen. Stat. § 52-596 provides that, "No action for the payment of remuneration for employment payable periodically shall be brought but within two years after the right of action accrues." This action, as mentioned, was commenced by service of process on May 12, 1999. Under Conn. Gen. Stat. § 31-71b(a), wages are to be paid weekly. Conn. Gen. Stat. § 31-68(a) allows an employee to bring an action at any time for unpaid minimum fair wages. See also
Conn. Gen. Stat. § 31-72. McKosky's right of action thus accrued every week that he was not paid. (It must be remembered that Count I deals only with McKosky's statutory wage claim; his claim of implied contract will be considered in connection with Count II.) Under these circumstances, McKosky can only claim wages due between May 12, 1997 (two years prior to service of process) and December 31, 1997 (the admitted terminus of his statutory claim).
It is undisputed that McKosky worked for Plastech fifty hours per month during this period of time. This period comprises seven and one-half months, or 375 hours of work. At a minimum fair wage of $4.25 per hour, his damages total $1,593.75.
Although the court has the power to award McKosky double damages, Conn. Gen. Stat. § 31-72, it declines to do so. Plastech was not at any time acting in bad faith or exploiting McKosky in any way. McKosky was a seasoned professional who at all times acted voluntarily to assist his longtime business partner. Punitive measures are inappropriate in these circumstances.
2. Count II
Count II alleges an "implied agreement" between the parties "that the Plaintiff would be compensated for his services." This allegation can be dealt with swiftly. "A contract implied in fact, like an express contract, depends on an actual agreement." Therrien v. SafeguardManufacturing Co., 180 Conn. 91, 94, 429 A.2d 808 (1980). The test is whether the conduct and acts of the parties show an agreement." BrighentiCT Page 7554v. New Britain Shirt Corp., 167 Conn. 403, 406, 356 A.2d 181 (1974). The conduct and acts of the parties here, established by the credible evidence, do not show an agreement, either express or implied, to compensate McKosky for his services prior to 1998. Even agreement on the concept of incentive pay (and there was no such agreement here), without more, "is too indefinite to permit recovery by way of a contract remedy, express or implied." Meaney v. Connecticut Hospital Association, Inc.,250 Conn. 500, 510, 735 A.2d 813 (1999). There is no implied contract here for any services performed prior to 1998.
Beginning in January 1998, the parties agreed that McKosky would be paid $1,500 per month for his services. This sum was in fact paid. That express agreement plainly precludes the assertion of an implied contract for any services performed after January 1998. Meaney v. ConnecticutHospital Association, Inc., supra, 250 Conn. at 517.
McKosky claims that in March 1992 Seavey indicated that there was hope for some compensation in the future if Plastech were to be turned around. In his testimony, however, McKosky could not remember Seavey's actual words. Seavey, in his testimony, denied making any such statement. The Court specifically finds that no such statement was given. In addition to considerations of witness demeanor, this finding is based on the undisputed fact that McKosky at no time brought up the topic of compensation between the time that he commenced working for Plastech (shortly after the March 1992 conversation) and January 1998, in spite of the fact that the company began to turn a profit in 1994. It is simply not credible that a seasoned professional (who did not impress the court as being in any way shy) would not bring up the topic of compensation for this many years if he had any hope or expectation of being compensated. The credible evidence establishes that McKosky was working exclusively as a volunteer and that both he and Seavey recognized this fact at all times between 1992 and 1998. Under these circumstances, McKosky has failed to establish liability on Count II.
3. Count III
Count III alleges unjust enrichment. This count can also be dealt with swiftly. Prior to 1998, Seavey expressly told McKosky that he (McKosky) would not be paid for his services. Both parties understood this fact perfectly. Under these circumstances, there was an express contract between the parties at all times. Prior to January 1998, the express contract was that McKosky would not be paid for his services. Beginning in January 1998, the express contract was that McKosky would be paid $1,500 per month for his services. This series of express contracts precludes the assertion of claim of unjust enrichment. Meaney v.Connecticut Hospital Association, Inc., supra, 250 Conn. at 517. CT Page 7555
This analysis has deep roots in the law. It is well established that "[a] person of full capacity who, pursuant to a contract with another, has performed services . . . or otherwise has conferred a benefit upon him, is not entitled to compensation therefor other than in accordance with the terms of such bargain. RESTATEMENT OF RESTITUTION § 107(1) (reported by none other than Professor Seavey). While it is ordinarily inferred that a person who requests another to perform services for him thereby bargains to pay for those services, that inference "may be rebutted by the closeness of the relationship of the parties." Id. cmt c.
Seavey (the Seavey here) and McKosky had been business partners for many years. The evidence makes it clear that this close relationship was the very reason that Seavey asked McKosky to provide his services without charge. No one else would have been willing to do this. McKosky, moreover, was an experienced business person. He could plainly be expected to render bills for his services if he intended to be paid. His complete and utter silence on the subject prior to January 1998 is persuasive evidence that he had no intention of being paid.
Payne v. Bank of America National Trust Savings Association,275 P.2d 128 (Cal.Dist.Ct.App. 1954), provides a useful precedent. Payne, like McKosky, was an accountant. He was a longtime friend of the defendant's testator, Priester. Priester was hospitalized for a lengthy period of time. During this time, Payne rendered substantial professional services to Priester on a daily basis. The court held that, under these circumstances, the presumption that the recipient of the services had bargained to pay for them was rebutted. It explained that:
The question of whether services were performed without expectation of monetary compensation, the parties having understood they were being gratuitously rendered or whether it can reasonably be implied that payment was in the contemplation of the parties, is one of fact to be gleamed from the circumstances of the particular case. . . . It is the expectation of the parties existing at the time the services were rendered or the benefits conferred that controls. . . . If at the time the services were originally rendered they were intended to be gratuitous or as an accommodation, motivated by friendship, kindness, or some other significant relationship existing between the parties, and they were tendered without any expectation of remuneration, they cannot afterwards be converted into an obligation to pay their reasonable CT Page 7556 value. . . .
Id. at 134. See Wright v. Sheldon, 53 A. 59 (R.I. 1902).
The court finds that, prior to January 1998, the parties expressly understood that McKosky's services were being rendered gratuitously. Although Plastech was undoubtedly enriched, it was not unjustly
enriched. Under these circumstances, McKosky's claim of unjust enrichment must fail.
B. Plastech's claims
1. First Count
Plastech's First Count alleges tortious interference with Plastech's contract with Malloy and with Plastech's "business expectancies." This claim is based on two distinct factual allegations. The first factual allegation is that McKosky unreasonably refused to consent to a "lease assignment." The second factual allegation is that McKosky filed the present action "solely for the purpose of interfering with the sale of Plastech Corporation." Neither factual allegation is supported by the credible evidence.
The allegation concerning a purported "lease assignment" will be considered first. This allegation fails on multiple levels. As mentioned, on February 4, 1999, Plastech signed a two-year lease with Investment Associates, commencing January 1, 1999, agreeing to rent the building and grounds for the sum of $7,500 per month. The credible evidence shows that when Malloy was seeking to purchase Plastech later that spring, he did not seek an assignment of the existing lease. He instead negotiated with Investment Associates seeking to obtain a new five-year lease with the subsequent option of a five-year renewal. The issue of a lease assignment never even arose.
Beyond this, the building and grounds in question were owned by Investment Associates, not McKosky. McKosky was, at the time, only a 50% partner in Investment Associates. If any tort has been committed in connection with the "lease assignment" allegation of the First Count (and none has), it would have been committed by Investment Associates, not McKosky personally.
The evidence further establishes that Investment Associates did nothing wrong in connection with the lease. As mentioned, on April 29, 1999, it proposed a rent of $8,500 per month to Malloy's attorney. This was approximately a 13% increase over the existing rent of $7,500 per month. It is true that the existing lease and been drafted only two months CT Page 7557 previously. That lease, however, had been negotiated between long-time business partners. There is no evidence that $8,500 was anything other than a fair market price for the building and grounds. Malloy's letter of May 13, 1999, while requesting certain repairs, makes no complaint about the proposed rent.
Seavey suggests that the Malloy deal fell through in part because Investment Associates claimed ownership of a bussduct, an electrical device that powered the molding machines. The evidence concerning actual ownership of the bussduct is confusing. The credible evidence suggests that it was a fixture in the building, and therefore owned by Investment Associates. The bussduct, however, cost only $17,000 in 1979, and by 1999 it was twenty years old. It is not conceivable, on this evidence, that the issue of bussduct ownership caused Malloy not to go through with a proposed $600,000 business purchase. For that matter, the evidence fails to establish the reason that Malloy did not go through with the deal. (Malloy did not testify.)
Connecticut has long recognized a cause of action for tortious interference with contract rights or other business relations. "[F]or a plaintiff successfully to prosecute such an action it must prove that the defendant's conduct was in fact tortious." Daley v. Aetna Life CasualtyCo., 249 Conn. 766, 805, 734 A.2d 112 (1999). (Internal quotation marks and citations omitted.) There was no tortious conduct here. Seavey's theory of violation is "remote from the core of the tort, illustrated by cases in which the defendant lures away the plaintiff's employee knowing that the employee has a contract with the plaintiff that he is breaking by going to work for the defendant. Lumley v. Gye . . . 118 Eng. Rep. 749 (Q.B. 1853)." Great Central insurance Co. v. Insurance Services Office,Inc., 74 F.3d 778, 784 (7th Cir. 1996). Investment Associates' conduct here consisted of demanding a rent which the evidence does not show to have been above the market price and claiming ownership of a fixture in its building. A claim of tortious interference directed against this conduct makes no sense in "an economic order committed to competition." Harvey S. Perlman, Interference with Contract and Other EconomicExpectancies: A Clash of Tort and Contract Doctrine, 49 U.CHI.L.REV. 61, 78 (1982). The tort is not established here.
Seavey's factual allegation that McKosky filed this action "solely for the purpose of interfering with the sale of Plastech Corporation" fares no better. The credible evidence simply fails to establish this asserted fact. Count I of McKosky's Second Amended Complaint has, in fact, been found meritorious. The imposition of tort liability "for the act of filing a non-sham lawsuit would present serious constitutional problems."Suburban Restoration Co. v. ACMAT Corp., 700 F.2d 98, 102 (2d Cir. 1983). See Zeller v. Consolini, 59 Conn. App. 545, 553, 758 A.2d 376
CT Page 7558 (2000), and authorities cited therein. The Connecticut common law of tortious interference should not be stretched to prohibit such an act.
For these reasons, the First Count fails of proof in its entirety.
2. Second Count
The Second Count alleges that the conduct complained of in the First Count constituted a CUTPA violation. As just discussed, the conduct complained of in the First Count has not been proved and is not tortious. In any event, the filing of a non-sham lawsuit cannot, as a matter of law, constitute a CUTPA violation. Zeller v. Consolini, supra,59 Conn. App. at 553. The Second Count, like the First, fails of proof.
3. Third Count
As mentioned, the Third Count has been abandoned.
4. Fourth Count
The Fourth Count alleges that the application for prejudgment remedy filed in this case constituted an abuse of process. This allegation fails of proof as well. "Abuse of process is the misuse of process regularly issued to accomplish an unlawful ulterior purpose." Schaefer v. O.K. ToolCo., 110 Conn. 528, 532, 148 A. 330 (1930). The credible evidence does not show that McKosky filed his application for prejudgment remedy to accomplish an unlawful ulterior purpose. Although his application was denied by DeMayo, J., McKosky has now prevailed on Count I of his Second Amended Complaint. Under the circumstances presented here, Seavey's claim of abuse of process has not been established.
5. Fifth Count
The Fifth Count alleges malicious prosecution. This allegation is plainly a misnomer, since "a malicious prosecution suit ordinarily implies a prior criminal complaint." Vandersluis v. Weil, 176 Conn. 353, 356,407 A.2d 982 (1978). This problem aside, even an action asserting malicious prosecution's civil-action sibling, vexatious litigation, would fail on these facts. "To establish either cause of action, it is necessary to prove want of probable cause, malice and a termination of suit in the plaintiff's favor." Id. The credible evidence here establishes none of these elements, and the absence of the third element (termination of suit in the plaintiff's favor) alone can fairly be called an insurmountable problem. This cause of action wholly fails of proof.
6. Sixth Count
CT Page 7559
The Sixth Count alleges breach of fiduciary duty. There can be no question that while McKosky and Seavey were partners in Investment Associates McKosky "occupied a fiduciary position with respect to [his partner], whom he owed `the duty of rendering true accounts and full information about everything which affect[ed] the partnership.' Weidlichv. Weidlich, 147 Conn. 160, 164, 157 A.2d 910 (1960)." Williams v.Bartlett, 189 Conn. 471, 482 n. 8, 457 A.2d 290, appeal dismissed,464 U.S. 801 (1983). As Cardozo, J. famously said, "Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." Meinhard v. Salmon, 164 N.E. 545, 546 (N.Y. 1928).
There is a nice question as to whether McKosky breached this standard here. At the time he sold his interest in Investment Associates to McKosky, on November 23, 1993, Seavey was well aware that InvestmentAssociates v. Aetna Casualty Surety Co. remained a pending case. The court file in that case was a public document, open for all, including Seavey, to see. One of the documents in that public file was a Motion to Exempt from Dormancy Program, filed by Aetna on November 1, 1993. That motion expressly states that "this matter in all likelihood should be settled in the near future." The credible evidence establishes that McKosky never conveyed this information to Seavey, and Seavey (a seasoned business person with ample resources to retain counsel) never bothered to look. Whether a failure to provide a partner with the readily obtainable is a breach of fiduciary duty is a nice question. Whether Seavey had an obligation to bring a timely action for an accounting in 1994 when he learned of the settlement in Investment Associates v. Aetna Casualty Surety Co. is another. See Greenhouse v. Zempsky, 153 Conn. 501, 505,218 A.2d 533 (1966).
Neither of these substantive issues need be resolved here. If Seavey has an action for breach of fiduciary duty at all, that action is plainly barred by the statute of limitations. "Where the general partner's obligation is recognized as being fiduciary, not contractual, a violation of that duty has been treated as a tort, not a breach of contract, for the purpose of determining the appropriate statute of limitations." 59A Am.Jur.2d Partnership § 1338 (1987). See Magna Associates v.Torgrove, 585 F. Sup. 585, 589 (D.Colo. 1984). The statute of limitations for tort cases in Connecticut is three years. Conn. Gen. Stat. §§ 52-577 52-584. (Sec. 52-584 contains an exception for "a counterclaim . . . interposed in any such action," but the "any such action" referred to is an action for negligence, reckless or wanton misconduct, or malpractice. The action brought by McKosky here, as discussed, is an action asserting statutory wage rights, breach of implied contract, and unjust enrichment. The counterclaim exception to § 52-584 does not apply in these circumstances.) CT Page 7560
The alleged breach of fiduciary duty here occurred on November 23, 1993. Even if McKosky's asserted nondisclosure is viewed as a continuing breach, that breach plainly ended in 1994, when Seavey beamed of the settlement in question. It cannot be a further continuing breach of fiduciary duty to fail to provide a partner with information he already has. Seavey first asserted the allegations asserted in the Sixth Count in an amended counterclaim filed on February 29, 2000. By this time, the applicable statute of limitations had long expired. McKosky has appropriately raised the statute of limitations as a special defense. Under these circumstances, Seavey's claim of breach of fiduciary duty must fail.
IV. CONCLUSION
Judgment shall enter for the plaintiff (McKosky) on Count I of the Second Amended Complaint in the amount of $1,593.75. Judgment shall enter for the defendants on Counts II and III.
Judgment shall enter for the counterclaim defendant (McKosky) on all six counts of the counterclaim.
Costs are awarded to the plaintiff (McKosky).
Jon C. Blue Judge of the Superior Court