**John R. MILLER, Plaintiff–Appellee,**

v.

**LeSEA BROADCASTING, INCORPORATED, Defendant–Appellant.**

No. 96–1273.

United States Court of Appeals, Seventh Circuit.

Argued May 28, 1996.

Decided July 2, 1996.

Franklyn M. Gimbel (argued), Kathryn A. Keppel, Gimbel, Reilly, Guerin & Brown, Milwaukee, WI, Thomas P. Aiello, Madrigrano, Gagliardi, Zievers & Aiello, Kenosha, WI, for Plaintiff–Appellee.

Constantine L. Trela (argued), David D. Meyer, Sidley & Austin, Chicago, IL, Dean P. Laing, O'Neil, Cannon & Hollman, Milwaukee, WI, for Defendant–Appellant.

Before POSNER, Chief Judge, and CUDAHY and EASTERBROOK, Circuit Judges.

POSNER, Chief Judge.

John Miller brought this suit in a Wisconsin state court against LeSea Broadcasting to enforce a right of first refusal to buy the Channel 55 television station in Kenosha. The defendant removed the suit to federal district court, basing federal jurisdiction on diversity of citizenship. Wisconsin law governs the substantive issues in the case. On cross-motions for summary judgment, the court held that Miller's right of first refusal entitled him to buy the station, and it ordered LeSea to sell it to him for $2.5 million. The sale has not taken place, although so far as we can tell LeSea's motion for a stay of the order of specific performance pending appeal has yet to be acted on by the district court.

LeSea owns a number of television stations. About half the programs broadcast by the stations are religious in character. ("LeSea" is short for "Lester Sumrall Evangelistic Association.") LeSea hired Miller to be the general manager of its Kenosha station in 1993. Miller drafted, and LeSea agreed to, a clause in the employment contract that entitled Miller, for as long as he was employed by LeSea and for two years after, to "match" any offer to purchase the station "upon the exact terms and conditions as contained in the offer."

In January of 1995, Paxson Communications Corporation, a large broadcaster, submitted to LeSea a proposal to buy Channel 55 for $2.5 million through an affiliated entity to be created. LeSea forwarded the proposal to Miller, who asked LeSea to furnish him with the actual offer, if one was made, so that he could decide whether to exercise his right of first refusal. No offer was made. But on March 31, LeSea signed a contract to sell the station, at the same price, to Christian Network, Inc. (CNI), a small religious broadcaster (not to be confused with Pat Robertson's Christian Broadcasting Network) founded by Lowell Paxson—the chairman of Paxson Communications Corporation. The contract contains a clause in which Paxson (the corporation, not the man) agrees to guarantee CNI's contractual obligations to LeSea. These obligations include not only the payment of the $2.5 million purchase price but

also the assumption of a lease and other contracts of Channel 55. Paxson separately agreed with CNI to operate the station. The contract of sale between LeSea and CNI provides that, if a court decides that Miller is entitled to buy the station, LeSea shall pay CNI $75,000 and "defend with due diligence against any effort by John Miller to assert any claim of right to acquire" the station. If the defense fails, and Miller buys the station, LeSea shall have no further liability to CNI except to pay the $75,000.

Miller received a copy of the contract between LeSea and CNI on April 12. The next day he told LeSea that he was exercising his right of first refusal. On May 26, after several back and forth communications, Miller—having obtained money for a down payment from a broadcasting concern that tentatively agreed to repurchase the station from him for $3 million—sent LeSea an executed contract for the purchase of the station. It was identical to the contract between LeSea and CNI except that Miller deleted the guaranty clause and LeSea had already, for obvious reasons, deleted the clause requiring it to defend against any effort by Miller to buy the station, and to compensate CNI if the defense failed. On June 1, LeSea notified Miller that by deleting the guaranty clause he had failed to match CNI's terms. Miller had already brought this suit, although he delayed serving LeSea until receiving its letter of June 1. En route to the final judgment from which LeSea appeals, Miller after a brief oral hearing obtained a preliminary injunction against LeSea's selling the station to CNI.

■ A right of first refusal is the weakest of options; technically it is not an option at all, because it does not require the grantor to offer the property subject to it for sale, ever. *Edlin v. Soderstrom,* 83 Wis.2d 58, 264 N.W.2d 275, 280 (1978); *Pincus v. Pabst Brewing Co.,* 893 F.2d 1544, 1549 (7th Cir. 1990); see generally 3 *Corbin on Contracts* §§ 11.3–11.4 (rev. ed. 1996). All it entitles the holder to do is to match an offer from a third party should the grantor of the option be minded to accept that offer. It is thus merely a preemptive right, although it becomes an option when the grantor decides to sell on the terms offered by the third party; at that point the holder of the option has the right to buy the property, a right that is a true option. E.g., *Bidache, Inc. v. Martin,* 899 P.2d 872, 874 (Wyo.1995).

The principal value of a right of first refusal to the holder, when the holder is a lessee of real estate (and it is in the real estate market that rights of first refusal are chiefly found), is that it enables him to avoid moving costs if he is willing to pay the current market price for the property that he is occupying—for rarely will a third party's offer significantly exceed that price. Corresponding to the lessee's interest is the managerial position that Miller held in Channel 55. The right of first refusal may have been designed to save him job-relocation costs if the station went on the market. The alternative, a requirement that any purchaser of the station assume Miller's employment contract, might have made the station very difficult to sell.

The cost to the grantor of a right of first refusal is slight, at least if the law requires that, for the holder to be able to exercise the right, the match between his offer and the third party's offer be exact. The requirement of exact matching has social as well as private value. Without it, the right is an impediment to the marketability of property, because it gives the holder of the right a practical power to impede a sale to a third party by refusing to match the third party's offer exactly and then arguing that the discrepancy was immaterial. Cf. *Frandsen v. Jensen–Sundquist Agency, Inc.,* 802 F.2d 941, 946 (7th Cir.1986). Consistent with insisting on exact matching, some cases say, such as *Lehr v. Breakstone,* 472 So.2d 1333, 1335 (Fla.App.1985), or imply, such as *Weber Meadow–View Corp. v. Wilde,* 575 P.2d 1053, 1055 (Utah 1978), that the holder of a right of first refusal may not defend a refusal to match a term in the third party's offer on the ground that the term is immaterial. Most cases, however, do not require the matching of immaterial terms, or, what appears to be the same thing, do not let insubstantial variations between the third party's offer and the right holder's offer defeat the right. *West Texas Transmission, L.P. v. Enron Corp.,*

907 F.2d 1554, 1566 (5th Cir.1990); *John D. Stump & Associates, Inc. v. Cunningham Memorial Park, Inc.*, 187 W.Va. 438, 419 S.E.2d 699, 705 (1992); *Brownies Creek Collieries, Inc. v. Asher Coal Mining Co.*, 417 S.W.2d 249, 252 (Ky.1967); *Vincent v. Doebert*, 183 Ill.App.3d 1081, 132 Ill.Dec. 293, 539 N.E.2d 856 (1989); *Matson v. Emory*, 36 Wash.App. 681, 676 P.2d 1029, 1032 (1984).

The Wisconsin courts have not taken sides in this conflict; and we shall see that there may be less to the conflict than meets the eye. In arguing for exact matching with no exception for immaterial terms, LeSea cites cases from Wisconsin and elsewhere that insist that the holder not of a right of first refusal but of an option comply exactly with the terms of the option. E.g., *Kreutzer v. Lynch*, 122 Wis. 474, 100 N.W. 887, 888 (1904); *Christmas v. Turkin*, 148 Ariz. 602, 716 P.2d 59, 60 (App.1986). LeSea also relies on the "mirror image" rule of general contract law: an acceptance to be effective must match the terms of the offer exactly. E.g., *Leuchtenberg v. Hoeschler*, 271 Wis. 151, 72 N.W.2d 758, 760 (1955). Once the condition precedent for the right of first refusal—namely that the seller has decided to sell on the terms in the third party's offer—is met, the right becomes an option to buy. LeSea characterizes the right holder's matching offer as the acceptance of the third party's offer, and argues that it must therefore match the terms of that offer exactly. LeSea also points out that the right of first refusal that it granted Miller uses the word "exact"—and was drafted by the recipient of the right, Miller himself, and so should be construed against him.

█ Since the negotiation and any resulting contract for the sale of the station would be between Miller and LeSea rather than between Miller and the third party, LeSea's invocation of the mirror-image rule is strained. Its invocation of the option rule is more effective, exposing a possible fault line in the cases that allow the holder of a right of first refusal to prevail even if his offer to buy does not exactly match the third party's offer. Although a right of refusal is not an option, it is awfully close, and it is not obvious why it should be treated differently so far as the matching requirement is concerned. The path of reconciliation may lie in noting the difference between terms and conditions stated in the option contract itself (or the contract granting the right of first refusal), and terms and conditions in the third party's offer, which are incorporated into the contract granting the right of first refusal merely by reference, not being foreseen when that contract is signed. We need not pursue this issue. The use of the term "exact" in the contract that created the right of first refusal in this case had the effect of subjecting the contract to the same legal standard that is in force in states that do not recognize a defense of immateriality when the holder of the right of first refusal does not match the third party's offer exactly, but instead treat options and rights of first refusal the same. The defense of immateriality in states that recognize it is merely a default rule. The parties can contract for a stricter standard. Cf. *West Texas Transmission, L.P. v. Enron Corp., supra*, 907 F.2d at 1562. They did here.

But even the cases (made applicable to this case by the terms of the contract) that appear to take the requirement of exact matching literally, and therefore make no exception for immaterial variations between the right holder's offer and the third party's offer, recognize three exceptions to the requirement, although we cannot find any cases dealing with the first two (they may be too obvious to have been litigated). These exceptions, we may assume, are implicit in the contract granting Miller the right of first refusal, for there is no indication that the contract meant to limit the right more strictly than any state would do. First and most obviously, the grantor of the right can waive exact matching, as LeSea did when it deleted from the contract it sent Miller the clause concerning LeSea's obligations in the event that Miller tried to exercise his right of first refusal. Not only was that clause irrelevant to a contract with Miller himself, but it was a clause that imposed obligations on the seller rather than on the buyer. Second, proper names need not be matched; otherwise Miller would have had to change his name to CNI to be entitled to exercise the option. LeSea did not insist that he do that or even

that he obtain his guarantee from Paxson rather than from some other firm that had the financial solidity necessary for an effective guaranty of the buyer's obligations under the contract of sale. Third, the grantor of the option may not act in bad faith, which in this context means may not, for the purpose of discouraging the exercise of the right, procure from the third party terms that the grantor knows are unacceptable to the holder of the right of first refusal. E.g., *Oregon RSA No. 6, Inc. v. Castle Rock Cellular of Oregon Limited Partnership*, 76 F.3d 1003, 1007 (9th Cir.1996); *West Texas Transmission, L.P. v. Enron Corp., supra,* 907 F.2d at 1563; *Prince v. Elm Investment Co.,* 649 P.2d 820, 824–25 (Utah 1982); *Brownies Creek Collieries, Inc. v. Asher Coal Mining Co., supra,* 417 S.W.2d at 252.

These qualifications are necessary—though only in states in which immateriality is not a defense to a refusal to match the exact terms offered by the third party—if rights of first refusal are to have any constraining effect on grantors. They do the work that the defense of immateriality does in the other states. Immaterial terms are likely to give rise to an inference of bad faith and so be excluded by the third qualification. Cf. *Prince v. Elm Investment Co., supra,* 649 P.2d at 825 n. 7. Thus it can be argued that the requirement of materiality simplifies rather than changes the law.

The law would be even simpler, and the marketability of property encumbered by a right of first refusal less impeded, without a requirement of materiality or good faith. And would the right holders really be worse off? For why would a seller *want* to defeat the right of first refusal if the holder of the right was willing to match every term in a third party's offer that the seller actually wanted? If the grantor hadn't wanted to sell to the holder of the right, why had he granted the right?

There are answers to these questions, and they bear on this case. One is that a bird in the hand is worth two in the bush. When a real live buyer appears the would-be seller may not want to risk losing him by giving the holder of the right of first refusal a chance to match the offer. Or nonpecuniary consider-

ations not reckoned on when the right was granted may come into play. (Any change in the money value of the property is taken care of by the requirement that the right holder match the price offered by the third party.) This may be a factor here. When Miller was hired to manage Channel 55 and received at his request the right of first refusal that he had drafted, the station was losing money hand over fist. LeSea had just tried to sell the station for the distress price of $1.3 million and had failed because the buyer had been unable to come up with the money. LeSea may have been desperate. But then along came Paxson and CNI, both very definitely part of the Christian broadcasting scene. It would be the most natural thing in the world for LeSea, which remains in the religious broadcasting business through its other stations, to prefer to sell to another Christian broadcasting company than to Miller, who appears willing, should he succeed in obtaining the station, to resell it to the highest bidder regardless of the character of its programming.

■ This discussion shows why the grantor of a right of first refusal might seek to thwart the holder. The district judge gave two reasons for thinking that LeSea had been doing just that in insisting that Miller find a guarantor of his obligations under a contract to buy the station. The first was that Paxson was, as the judge put it, more of a partner of CNI than a guarantor. Apparently this is an allusion not only to the agreement between Paxson and CNI by which Paxson was to operate the station but also to Paxson's having earlier considered making its own offer to buy the station from LeSea, without CNI, and (though the judge didn't mention this) to Lowell Paxson's having created CNI, possibly as a vehicle for acquiring stations to be operated by Mr. Paxson's company.

The pertinence of these circumstances is not immediately apparent. CNI was to be the purchaser, not Paxson; so Paxson's guarantee would have value. Whatever historical or for that matter current relationship between CNI and Paxson, they are independent entities within the contemplation of the laws relating to contractual guaranties and

insolvency and Paxson is a much more substantial entity than CNI. Miller ridicules the very idea of a guarantee, pointing out that the sale of Channel 55 was to be a cash transaction. Not quite. The purchaser, CNI (or Miller, had he succeeded in stepping into CNI's shoes), was to assume the station's contracts, taking LeSea, which of course remained liable under them notwithstanding the sale of the assets of the station, off the hook. That was a continuing albeit merely contingent liability for LeSea. It was natural for LeSea to want a guarantor, whether CNI or Miller was the purchaser, so that it would bear no risk of someday incurring liability to the persons who had contracts with the station. Nor is it certain, as Miller argues, that there would have been no guarantor had Paxson been the buyer, as originally contemplated. Paxson had proposed to acquire the station "through an affiliated entity to be formed"; Paxson may have intended to guarantee the new entity's obligations to the seller. And, as the district judge neglected to point out, Paxson had guaranteed at least one previous contract for the purchase of a television station by a wholly owned subsidiary of CNI, casting some doubt on Miller's argument that the purchase of Channel 55 by CNI with Paxson as operator-guarantor was hoked up to defeat the right of first refusal.

The second reason the judge gave for finding that LeSea had acted in bad faith was the clause in its contract with CNI concerning Miller's right of first refusal. The clause gave LeSea an incentive to resist the right, because if it was exercised and the station was sold to Miller, LeSea would have to pay CNI $75,000; and if LeSea failed to fight the enforcement of Miller's right it might be found to have failed to exercise the "due diligence" required by the same clause of the contract, possibly exposing it to an additional liability in damages to CNI. Having signed this contract before Miller exercised his right of first refusal, LeSea had, in the judge's mind, repudiated the right.

This conclusion places more weight on the wording of the clause than is reasonable. It would be natural for the intending purchaser from a seller who had granted a right of first refusal to want protection from the possibility of becoming entangled in a legal dispute with the holder of the right. And if LeSea believed it unlikely that Miller would exercise his right of first refusal, perhaps suspecting that he would find it difficult to find a guarantor (as proved to be the case), it would be willing to grant the buyer this protection. We do not understand the clause to mean that LeSea agreed to resist Miller if it had no legal basis for doing so; that would be an agreement to engage in unethical, and indeed unlawful, behavior. The duty imposed was comparable to the duty to defend in an insurance contract. It was not absolute.

So the reasons the judge gave for finding that LeSea had acted in bad faith do not support the finding. That is not to say that there is no evidence to support it. The responsible executive of LeSea acknowledged at the hearing on the motion for a preliminary injunction that he preferred to sell the station to another Christian broadcasting company than to Miller. Paxson's proposal does not state that it will guarantee the contractual obligations of the "affiliated entity to be formed." And it may be (or may not, for the record does not indicate what the common practice is in this regard) a suspicious circumstance that LeSea actually *signed* the contract with CNI containing the defense clause before showing the contract to Miller to see whether he would match it; it is as if LeSea were determined, by hook or by crook, to defeat Miller's right. And remember that by signing the contract LeSea agreed to fork over $75,000 to CNI if Miller bought the station. We do not think, therefore, that LeSea was entitled to summary judgment. But, as should be plain, neither was Miller.

After the judge granted the preliminary injunction and set the case for trial on the merits, the parties filed cross-motions for summary judgment and consented to the removal of the case from the trial calendar to enable the judge to act on the motions. Miller argues that the parties in effect consented to trial on the existing record, which consisted mainly of the testimony given and documents submitted at the hearing on the motion for a preliminary injunction. He asks

us to give the district judge's finding of bad faith the usual deference that is given to the application by the trier of fact of a legal rule to the facts. *Brooks v. Buscher,* 62 F.3d 176, 179 (7th Cir.1995); *G.J. Leasing Co. v. Union Electric Co.,* 54 F.3d 379, 385 (7th Cir. 1995); *Mucha v. King,* 792 F.2d 602, 604–06 (7th Cir.1986).

■ Even if the parties *had* consented to a trial on the pretrial record, we could not affirm, because the reasons that the judge gave for finding that LeSea had acted in bad faith do not support the finding. But were that the only problem our proper course would be to remand the case for reconsideration by the judge on the existing record. It is not the only problem. The parties did not consent to waive trial. The filing of cross-motions for summary judgment is not such a waiver. *Market Street Associates Limited Partnership v. Frey,* 941 F.2d 588, 590 (7th Cir.1991); 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2720, p. 19 (2d ed.1983). All it means is that each party thinks he is entitled to judgment without trial, but wants a trial if the judge disagrees. It is true that Miller told Judge Gordon that he was willing to waive a trial and have the case decided on the summary judgment papers, and that LeSea said that it thought the case could be disposed of that way. But this was not an explicit waiver of LeSea's right to a trial and we think it unlikely that it meant to put all its eggs in the summary judgment basket—especially after having just lost on Miller's motion for a preliminary injunction.

So the case must go back for trial, but we are not yet done because we must consider LeSea's argument that on no account is Miller entitled to specific performance. Miller argued in the district court, and repeats here, that he is entitled to specific performance because a television station is a unique property and the value of owning one cannot be commuted to cash. He even told the district court that his First Amendment rights would be infringed if he was prevented from buying Channel 55. Yet it is perfectly plain that he wanted to resell the station for $500,000 above the $2.5 million price that CNI was offering for it (and that he wanted

to match), and he had two offers at that price. One indeed was described as a proposal to buy Miller's right of first refusal for $500,000.

■ The normal remedy for breach of contract is an award of damages. Specific performance is exceptional, for reason unnecessary to get into here. See *Walgreen Co. v. Sara Creek Property Co.,* 966 F.2d 273 (7th Cir.1992); *Great Central Ins. Co. v. Insurance Services Office, Inc.,* 74 F.3d 778, 784 (7th Cir.1996). The exception comes into play when damages are an inadequate remedy, whether because of the defendant's lack of solvency or because of the difficulty of quantifying the injury to the victim of the breach. The latter condition is often satisfied when the specific performance sought is the sale of an entire business. See, e.g., *Medcom Holding Co. v. Baxter Travenol Laboratories, Inc.,* 984 F.2d 223, 227 (7th Cir.1993). There is even a case so holding that involved the sale of a television station. *Hawaiian Paradise Park Corp. v. Friendly Broadcasting Co.,* 414 F.2d 750, 758 (9th Cir.1969). And of course if the buyer has made a contract to resell the property and would be in breach of it unless he obtained specific performance, this is a consideration favoring specific performance. *Texaco v. Creel,* 310 N.C. 695, 314 S.E.2d 506, 512 (1984). It is not a factor here.

■ In a case in which, although the contract is for the sale of an entire business, the buyer's negotiations to resell the property enable his loss from the breach to be exactly monetized, the case for specific performance collapses. *Watkins v. Paul,* 95 Idaho 499, 511 P.2d 781, 783 (1973); *Klein v. PepsiCo,* 845 F.2d 76, 80 (4th Cir.1988); cf. *Sundstrand Corp. v. Standard Kollsman Industries, Inc.,* 488 F.2d 807, 815 (7th Cir.1973). We know that Miller lost $500,000 by being denied the purchase of the station, and there is no suggestion that LeSea is not good for this amount. At argument Miller's lawyer suggested that Miller would have remained the manager of the station had it been resold to a third party purchaser. But the offer papers said nothing about assuming Miller's employment contract. Nor had Miller ever suggested that the loss of his managerial position was a part of the injury that he sustained as a result of the alleged breach of

contract, until the oral argument in this court—which was too late.

He had argued in the district court that he would have difficulty proving up the $500,000 loss because LeSea would point to the fact that the $3 million offers were tentative; both prospective purchasers might have backed out. A good point, but moot in light of concessions made by LeSea in its briefs in this court, where it describes Miller's loss as "fixed" and refers to one of his deals with a third party purchaser as a "commitment" to give Miller a $500,000 profit. In light of these concessions, made to persuade us to rule out equitable relief which LeSea obviously fears more, it will not be open to LeSea on remand to question the amount of Miller's damages if Miller is able to prove that LeSea acted in bad faith in refusing to honor his right of first refusal. With one qualification: Miller's deals to resell the station included a 5 percent broker's fee; we do not know how much (if any) of that fee was to come out of his $500,000. This is a question to be determined on remand.

The judgment of the district court is reversed with instructions to dissolve the preliminary injunction, and the case is remanded for trial.

REVERSED AND REMANDED.