IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 115,819

KEVIN W. TREAR,
*Appellant/Cross-appellee*,

v.

SUSAN J. CHAMBERLAIN, NATHAN GOODELL, and JAMIE JASNOSKI,
*Appellees/Cross-appellants.*

SYLLABUS BY THE COURT

1.

The interpretation and legal effect of written instruments are matters of law over which appellate courts exercise unlimited review.

2.

The primary rule for interpreting written contracts is to ascertain the parties' intent. If the contract terms are clear, the parties' intent is to be determined from the contract language without applying rules of construction. If, on the other hand, the court determines a written contract's language is ambiguous, the court may consider extrinsic or parol evidence to construe it. If the contract language is ambiguous, and the parties' intent cannot be ascertained from undisputed extrinsic or parol evidence, summary judgment is inappropriate.

3.

A court may not reform an instrument by rejecting words of clear and definite meaning and substituting others. When a written instrument is complete, the court will not imply an additional term. Contract language is ambiguous only when the words used

to express the parties' meaning and intention may be understood to reach two or more possible meanings.

Review of the judgment of the Court of Appeals in 53 Kan. App. 2d 385, 388 P.3d 607 (2017). Appeal from Lyon District Court; W. LEE FOWLER, judge. Opinion filed August 24, 2018. Judgment of the Court of Appeals reversing the district court is affirmed. Judgment of the district court is reversed and the case is remanded.

*Stuart N. Symmonds*, of Symmonds & Symmonds, LLC, of Emporia, argued the cause, and *Robert N. Symmonds*, of the same firm, was with him on the briefs for appellant/cross-appellee.

*Vernon L. Jarboe*, of Sloan, Eisenbarth, Glassman, McEntire & Jarboe, LLC, of Topeka, argued the cause and was on the supplemental brief for appellees/cross-appellants, and *Karen K. McIlvain*, of McIlvain Law Office, LLC, of Madison, was on the briefs for appellees/cross-appellants.

The opinion of the court was delivered by

BILES, J.:  This is an action for equitable relief stemming from a 1986 real estate contract containing a "first right of refusal" applicable to a separate land tract. Kevin W. Trear seeks specific performance and title to a smaller parcel that was sold after he ignored an earlier offer to sell him the entire tract subject to the 1986 contract. The district court and a Court of Appeals panel differed on how they approached the issues and arrived at conflicting outcomes. We granted review and now affirm the Court of Appeals judgment as right for the wrong reason.

As we view the contract's language, this first right of refusal was fulfilled after Trear failed to respond to the offer to sell him the full tract subject to the contract. We remand to the district court for further proceedings because there remains an unresolved claim as to whether the parties discharged their implied duty of good faith and fair

2

dealing when the offer was presented. Answering this question will determine whether the first right of refusal provision lapsed when Trear failed to respond.

FACTUAL AND PROCEDURAL BACKGROUND

In 1986, Trear purchased real estate in Lyon County from Susan Chamberlain and her now-deceased husband. The sale contract included a preemptive provision for adjoining land Chamberlain and her husband were retaining. The provision stated in relevant part:

> "The parties mutually agree that in the event the real estate presently owned by SELLERS which is adjoining the real estate which is the subject of this Contract, is offered for sale by SELLERS, SELLERS shall extend unto PURCHASER the first right of refusal to purchase said adjoining real estate at a price and upon terms mutually agreed upon by the parties. If the parties cannot agree, this right of first refusal shall lapse and thereafter be considered null and void."

The contract further stated it was "binding upon the heirs, legal representatives, and assigns of the parties hereto."

After Chamberlain's husband passed away in 2013, she attempted to sell Trear the 73 adjoining acres covered by the 1986 contract. The tract included the house where Chamberlain and her husband had lived. The sale price was $289,000. The offer's written terms stated it would expire eight days later and further explained, if Trear did not reply, "any obligations [Chamberlain] may or may not have to offer the real estate to [Trear would] be fulfilled." Trear did not respond.

Chamberlain then listed the 73-acre tract with a real estate agency at a $295,000 asking price. In a follow-up letter to Trear, Chamberlain's attorney advised him of the

3

listing and asked him to contact the agent if Trear wished to purchase the property. The letter also expressed the belief that Chamberlain had fulfilled her obligation to offer the property to Trear first. Trear made no offers, counteroffers, or other attempts to negotiate with Chamberlain or otherwise pursue the sale.

The listed property did not sell and was taken off the market. About a year later, Chamberlain sold 64 of those 73 acres to her daughter, Jamie Jasnoski, and Nathan Goodell for $91,124. This sale did not include the house.

Trear sued Chamberlain, Jasnoski, and Goodell, alleging the sale violated his first right of refusal. He sought various equitable remedies, including specific performance permitting him to purchase the 64 acres for the price Jasnoski and Goodell paid.

The district court entered summary judgment for defendants. It decided the first right of refusal clause—when combined with the binding provision on heirs, legal representatives, and assigns—violated the rule against perpetuities and was unenforceable. But the court rejected defendants' alternative arguments that the first right of refusal clause violated the statute of frauds and that Chamberlain had complied with the contract by offering to sell the 73 acres to Trear the year before selling the smaller tract to someone else.

On Chamberlain's claim that the failure to reach mutually agreeable terms in 2013 extinguished her obligation, the district court ruled:

> "*The 'right of first refusal' is a term of art and allows a party the right to refuse a price offered to another person even though it does not say that in this contract*. The court finds that the intent of the parties could not have been to offer it to a party for double or triple the price, then turn around and sell it to another party for much less. The court finds that the 'right of first refusal' means the right to accept an offer that has been agreed to by

the seller with someone else, and as such, Ms. Chamberlain's actions did not satisfy provision 6 of the contract." (Emphasis added.)

The district court did not address Trear's argument that Chamberlain failed to satisfy the contract provision because she breached the implied covenant of good faith and fair dealing. It also did not consider defendants' argument that Trear did not exhibit good faith and fair dealing by ignoring the 2013 offer and listing. We presume this is because the ruling on the other issues rendered those questions moot.

Trear appealed from the dispositive rule-against-perpetuities decision. Defendants cross-appealed, arguing they were entitled to judgment on their alternative statute of frauds and contract compliance arguments. A Court of Appeals panel reversed, disagreeing with the district court's rule-against-perpetuities decision. *Trear v. Chamberlain*, 53 Kan. App. 2d 385, 391, 388 P.3d 607 (2017). It also held the first right of refusal clause was enforceable under the statute of frauds and agreed with the district court that defendants were not entitled to judgment on their claim that Chamberlain fully performed under the 1986 contract. 53 Kan. App. 2d at 393.

We granted defendants' petition for review solely on the panel's contractual compliance analysis. The rule against perpetuities and statute of frauds questions are not before us.

Jurisdiction is proper. K.S.A. 20-3018(b) (petition for review of Court of Appeals' decision); K.S.A. 60-2101(b) (providing Supreme Court jurisdiction over cases subject to review under K.S.A. 20-3018).

5

THE FIRST RIGHT OF REFUSAL PROVISION

Defendants argue Chamberlain's 2013 offer to sell the 73-acre tract discharged the contractual obligation she owed Trear under the 1986 agreement. We hold the panel both misread the contract and improperly inserted terms inconsistent with the plain language under consideration.

*Standard of Review*

Our standard for reviewing a district court's summary judgment ruling is well known:

> """Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied.""" *Armstrong v. Bromley Quarry & Asphalt, Inc.*, 305 Kan. 16, 24, 378 P.3d 1090 (2016).

The issue is whether the 1986 contract required Chamberlain to offer Trear the smaller 64-acre tract at the same price that the smaller tract was sold nearly one year later after he ignored her previous efforts to sell him the entire 73-acre tract that included the disputed property. We must interpret the 1986 contract to resolve this matter.

6

To the extent "material facts are uncontroverted, an appellate court reviews summary judgment de novo." *Superior Boiler Works, Inc. v. Kimball*, 292 Kan. 885, 890, 259 P.3d 676 (2011) (citing *Central Natural Resources v. Davis Operating Co.*, 288 Kan. 234, 240, 201 P.3d 680 [2009]; *Troutman v. Curtis*, 286 Kan. 452, Syl. ¶ 1, 185 P.3d 930 [2008]).

"The interpretation and legal effect of written instruments are matters of law over which appellate courts exercise unlimited review, including whether a written instrument is ambiguous." *Thoroughbred Assocs. v. Kansas City Royalty Co.*, 297 Kan. 1193, 1207, 308 P.3d 1238 (2013). Our review is "unaffected by the lower courts' interpretations or rulings." *Born v. Born*, 304 Kan. 542, 554, 374 P.3d 624 (2016) (citing *Prairie Land Elec. Co-op. v. Kansas Elec. Power Co-op.*, 299 Kan. 360, 366, 323 P.3d 1270 [2014]).

"'The primary rule for interpreting written contracts is to ascertain the parties' intent. If the terms of the contract are clear, the intent of the parties is to be determined from the language of the contract without applying rules of construction.' [Citations omitted.] If, on the other hand, the court determines that a written contract's language is ambiguous, extrinsic or parol evidence may be considered to construe it. [Citations omitted.] In addition,

"'[a]n interpretation of a contractual provision should not be reached merely by isolating one particular sentence or provision, but by construing and considering the entire instrument from its four corners. The law favors reasonable interpretations, and results which vitiate the purpose of the terms of the agreement to an absurdity should be avoided. . . . [Citations omitted.]

". . . But, if the language of a contract is ambiguous and the intent of the parties cannot be ascertained from undisputed extrinsic or parol evidence, summary declaratory judgment is inappropriate." *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 963-64, 298 P.3d 250 (2013).

*Discussion*

It is undisputed that: (1) Chamberlain offered to sell Trear the adjoining real estate covered by the 1986 contract; (2) she made that offer before trying to sell the land to anyone else; (3) Trear took no action; and (4) the parties did not mutually agree on a price or terms after Trear did not respond. Accordingly, our focus is on whether Chamberlain's 2013 overtures to Trear satisfied the contractual language as contemplated so that the first right of refusal lapsed as provided, i.e., "*If the parties cannot agree [on price and terms]*, this right of first refusal shall lapse and thereafter be considered null and void." (Emphasis added.)

Trear argues he was contractually entitled to an opportunity to purchase the 64 acres under the same terms for which they were sold, citing *Anderson v. Armour & Co.*, 205 Kan. 801, 805, 473 P.2d 84 (1970). The panel agreed, reasoning:

> "A right of refusal is a defined legal term. Under a right of refusal, when a seller forms the intent to sell the property subject to the right an option contract between the seller and the holder of the right is formed. See *Miller v. Alexander*, 13 Kan. App. 2d 543, 552, 775 P.2d 198 (1989). The holder of the right may exercise the option contract and purchase the land, but if the holder does not exercise that right the seller is free to sell the land. See *Anderson*, [205 Kan. at 804-05]." *Trear*, 53 Kan. App. 2d at 393.

We have generally described a right of first refusal in similar terms:

> "In a right of first refusal situation, each party gives up something in exchange for increased certainty of opportunity to make a deal. The seller gives up its chance to negotiate with the holder of the right of first refusal for a price higher than the one a third party is willing to offer. *The holder of the right of first refusal gives up its chance to negotiate with the seller for a price lower than one the seller is willing to accept from a third party*. See *Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376,

8

382-83, 805 N.E.2d 957 (2004) (right holder runs risk that third-party may offer more than holder willing to pay) (citing *Miller v. LeSea Broadcasting, Inc.,* 87 F.3d 224, 226 [7th Cir.1996]). *The key to activation of a holder's right of first refusal is mutual willingness to enter into a sale at a specific price satisfactory to both the third party and the seller*. The seller may not force a purchase by the holder of the right of first refusal at a higher price. The holder of the right of first refusal may not force a sale to it at a lower price. *Room to dicker is effectively circumscribed on both sides of the table by the necessity for price acceptability to the third party*. See *Miller,* 87 F.3d at 226; *In re Adelphia Communications Corp.,* 368 B.R. 348, 352-53 (Bankr. S.D.N.Y. 2007); *Uno Restaurants, Inc.,* 441 Mass. at 383. The nature of a right of first refusal agreement means that neither the seller nor the right holder remains free to exercise unfettered business judgment to use the sale of the subject property or other asset to maximize profit or shareholder value. Each has voluntarily constrained such judgment and taken on obligations to the other. See *Navasota Resources v. First Source Texas,* 249 S.W.3d 526, 537-39 (Tex. App. 2008) (no unreasonable restraint on alienation on holding seller to right of first refusal limits)." (Emphases added.) *Waste Connections*, 296 Kan. at 968-69.

But this general description cannot be blind to the express terms of the 1986 contract language, despite use of a "first right of refusal" label.

First, the "key to activation" of Trear's contractual right was Chamberlain's intention to offer the property for sale, not her """specific intention to sell""" to a third party. *Waste Connections*, 296 Kan. at 969 (under the contract language at issue in that case, "[a] seller must form the '"specific intention to sell"' in order for the right of first refusal to ripen into an '"enforceable contract right"' or option equivalent"). The 1986 contract provided that when the real estate subject to it "is offered for sale by SELLERS, SELLERS shall extend unto PURCHASER the first right of refusal to purchase said adjoining real estate at a price and upon terms mutually agreed upon by the parties." It is undisputed Chamberlain gave Trear that opportunity before she listed the property with a real estate agent.

9

Second, the 1986 contract did not require Trear to accept or reject terms Chamberlain may have reached with a third party. To the contrary, the agreement contemplated they would negotiate first with each other in search of mutually satisfactory price and terms. And it is undisputed that satisfactory price and terms were not reached after Trear ignored Chamberlain's overtures and failed to follow up on the later real estate listing. And just as plainly, once the parties failed to reach agreement on both price and terms, the obligation would end because the contract stated: "If the parties cannot agree, this right of first refusal shall lapse and thereafter be considered null and void."

In other words, what Chamberlain and Trear bargained for in 1986 was his first right to negotiate with Chamberlain before any other potential buyers could acquire the property. And that chance was what Trear got. He simply failed to pursue it.

In reaching contrary conclusions, the district court and panel had to imply additional terms into the contract simply based on the phrase "first right of refusal." And they did so without considering the expressed process set out in the contract. The district court concluded that "the 'right of first refusal' means *the right to accept an offer that has been agreed to by the seller with somebody else*." (Emphasis added.) As explained, the 1986 contract made no mention of price or terms relative to a third party. Whatever was to happen was between Trear and Chamberlain.

Likewise, the panel concluded "the district court correctly interpreted the contract to mean that when Chamberlain received an offer on the property, she must extend a chance to Trear to purchase the property *at the price that the third party is offered*." (Emphasis added.) *Trear*, 53 Kan. App. 2d at 393. To support this, the panel set out what it described as the accepted legal definition of a right of refusal, then reasoned "[t]he

10

plain language of this contract states that Trear has a right of refusal." 53 Kan. App. 2d at 393. Again, no third-party language was expressed in the contract.

"[A] clearly indicated contrary intent" can deprive words or phrases of their ordinary legal meanings depending on context. *Campbell v. McBurney*, 201 Kan. 26, 31-32, 439 P.2d 133 (1968) (construing will). Any implicit terms that might be thought to follow from the phrase "first right of refusal" in the lower courts' view obviously conflicted with the explicit language that the obligation to Trear would "lapse and thereafter be considered null and void" when the parties did not agree upon a price and terms among themselves after Chamberlain decided to sell and offered the property first to Trear.

> "It is not within the province of a court to reform an instrument by rejecting words of clear and definite meaning and substituting others. [Citation omitted.] When a written instrument is complete, the court will not imply an additional term. [Citation omitted.] Language in a contract is ambiguous only when the words used to express the meaning and intention of the parties are insufficient in that the contract may be understood to reach two or more possible meanings. [Citations omitted.]" *Havens v. Safeway Stores*, 235 Kan. 226, 231, 678 P.2d 625 (1984) (holding trial court erred disregarding contract language and looking at industry practice to conclude party breached contract).

See also *Constellation Development, LLC v. Western Trust Co.*, 882 N.W.2d 238, 243 (N.D. 2016) ("'It is the substance of the agreement that controls, not the titles or labels attached by the parties.'").

The parties' intent, as expressed in their contract, for something other than what the lower courts implied as a "right of first refusal" is unmistakable. The lower courts erred by imposing a different meaning and accompanying unwritten requirements into

this agreement. In effect, what the lower courts did was rewrite the terms beyond the parties' expressed intent that Trear have the first opportunity to negotiate with Chamberlain when she desired to sell the adjoining property.

Trear nonetheless argues his right persisted despite his failure to respond and applied to the 64-acre, land-only tract Chamberlain later sold. He relies on *Anderson*, 205 Kan. 801, in which the court held a vendor could not circumvent a preemptive right to purchase by selling a larger tract than that to which the right attached. The *Anderson* court reasoned that although the contract referenced a smaller tract, "it was [the vendor] who prepared the [contract] and if it was intended that the provision not apply in the event [the vendor] desired to sell more than just that tract . . . the clause could have so provided." 205 Kan. at 805. But *Anderson* is distinguishable on its facts because the 2013 offer included all the property in the sale Trear now challenges, not the other way around as in *Anderson*.

Trear undisputedly had the opportunity to negotiate with Chamberlain to purchase the real estate subject to the contract upon mutually acceptable price and terms when she approached him in 2013. Had he been interested in the smaller 64-acre tract, nothing prevented him from trying to negotiate that with Chamberlain as part of the "terms [to be] mutually agreed upon by the parties," as stated in their agreement when Chamberlain first offered him the entire tract. But Trear ignored Chamberlain's offer entirely, as well as the subsequent invitation from Chamberlain's attorney to contact the listing agent if interested in the property. Under these facts, Trear's right would lapse under the express terms in the 1983 agreement—unless there is something to his good faith and fair dealing claim discussed below.

We hold the panel erred when it concluded the contract required Chamberlain to extend to Trear the same terms she reached with Jasnoski and Goodell. The contract

language simply does not support the panel's holding. But we affirm the panel's outcome because it was right for the wrong reason. See *Atkins v. Webcon*, 308 Kan. 92, 419 P.3d 1, 8 (2018).

Finally, we consider defendants' request that if we agree with their contract interpretation, we should direct the district court to enter judgment in their favor. This we cannot do because an issue remains over Trear's claim that Chamberlain violated the implied covenant of good faith and fair dealing embedded in any contract. See *Waste Connections*, 296 Kan. at 973; *Trear*, 53 Kan. App. 2d at 393 (noting price discrepancy between offer and sale price raised questions concerning Chamberlain's good faith).

At summary judgment, Trear appeared to argue Chamberlain breached this implied duty solely based on the difference between the asking price in her 2013 offer and the price Jasnoski and Goodell eventually paid for the smaller tract without the house. Admittedly, this seems like a stretch given that Trear made no effort to negotiate with Chamberlain over price or terms after she contacted him. In other words, there would seemingly need to be a little back and forth between the parties upon which to base a lack of good faith claim and the facts indicate there was none because Trear did nothing to respond to Chamberlain's offer.

The district court's factual findings on summary judgment noted only that Trear complained in his petition that Chamberlain's offer was "artificially high," but the court then went on to find that neither "prior to filing the suit, nor after the offer to sell was extended to him, [Trear] did not appraise the house and approximately 70 acres." It is impossible to make anything of this finding on appeal, so it needs to be sorted out by the district court. See Supreme Court Rule 8.03(h) (2018 Kan. S. Ct. R. 56) (providing in civil cases Supreme Court may consider issues "presented to the Court of Appeals and that the parties have preserved for review").

13

To be sure, Kansas recognizes a duty of good faith and fair dealing is embedded in every contract except those for employment-at-will. *Waste Connections*, 296 Kan. at 965.

> """Every contract implies good faith and fair dealing between the parties to it, and a duty of co-operation on the part of both parties. . . . [T]here is an implied undertaking in every contract on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out his part of the agreement, or do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. Ordinarily if one exacts a promise from another to perform an act, the law implies a counterpromise against arbitrary or unreasonable conduct on the part of the promisee. However, essential terms of a contract on which the minds of the parties have not met cannot be supplied by the implication of good faith and fair dealing." [Citations omitted.]'" 296 Kan. at 965.

For their part, defendants claimed they were entitled to summary judgment based on Trear's lack of good faith they perceive in his failing to negotiate at all with Chamberlain. But whether either party's good faith claim is susceptible to legal effect on summary judgment must be decided by the district court. See *Estate of Draper v. Bank of America, N.A.*, 288 Kan. 510, 528, 205 P.3d 698 (2009) ("While good faith . . . [is] usually [a question] of fact, summary judgment may be appropriate if the facts are uncontroverted and establish that a defined standard has not been met.").

The Court of Appeals' judgment reversing the district court is affirmed, although under a different rationale than the one employed by the panel. The case is remanded to the district court for further proceedings.

*  *  *

JOHNSON, J., concurring in part and dissenting in part:  I concur with the majority's well-reasoned and well-written interpretation of the "first right of refusal" provision of the 1986 contract between the Chamberlains and Kevin Trear (hereafter 1986 contract). Specifically, I agree that the parties to the 1986 contract bargained for Trear to have a "first right to negotiate" with Susan Chamberlain to purchase the described adjoining real estate upon terms and for a price that were mutually agreeable to the parties, without reference to any offers, contracts, or sales to persons or entities not a party to the contract; and that the failure of the parties to agree on price and terms after that first negotiation would cause Trear's special rights to purchase the real estate to lapse.

Further, I agree that Trear got what he bargained for when Susan Chamberlain offered to sell him the described adjoining real estate *before* she listed that property for sale to the public; that under the express terms of the 1986 contract, Trear's first right to negotiate lapsed when he failed to negotiate—or even respond—to Chamberlain's first proffer or subsequent public listing; and that the 1986 contract did not require Chamberlain to extend to Trear the same price and terms she offered to Jamie Jasnoski and Nathan Goodell a year later on only an *unimproved portion* of the described adjoining real estate.

But I part company with the majority when it concludes that, after we hold that Trear had no contractual right to obtain the relief he sought in his petition, we nevertheless cannot make the legal determination that the district court, in granting defendants summary judgment, reached the correct result, albeit based upon a different rationale. To the contrary, the majority holds that the district court's "factual findings on summary judgment" were insufficient for us to determine whether Trear's claim that Chamberlain breached the implied covenant of good faith and fair dealing (hereafter

15

"good faith covenant") was sufficient for him to survive summary judgment. Rather, the majority believes that a remand to the district court is procedurally required because at least one of its factual findings "needs to be sorted out by the district court." Slip op. at 13. Specifically, the majority appears confused by the district court's finding that Trear did not appraise the described adjoining real estate, either at the time it was offered to him by Chamberlain or before he filed suit; yet, the district court also noted Trear's petition allegation that Chamberlain's offer was "artificially high."

First, I would observe that it is unclear whether the majority is reversing the district court's grant of summary judgment to defendants, thereby remanding for a trial on Trear's purported good faith covenant claim. Or, whether the majority is remanding for the district court to reconsider the summary judgment motion after making more detailed factual findings in relation to the good faith covenant issue. But either way, I disagree with the notion that this court cannot resolve the good faith covenant issue, as a matter of law, right here, and right now.

Anticipating a suggestion that the good faith covenant question is not properly before this court for review, I would submit that proposition would ignore that the overarching question in this case is whether Chamberlain breached the "first right of refusal" provision in the 1986 contract. The defendants' summary judgment motion claimed, *inter alia*, that Chamberlain had performed her duties under the 1986 contract; Trear responded that Chamberlain had breached the contract; after the district court granted summary judgment on another ground, the Court of Appeals effectively held that Chamberlain breached the 1986 contract by denying Trear his right of first refusal. And as the majority correctly states, a good faith covenant is imbedded in every contract. Ergo, a breach of the good faith covenant is a breach of the contract, which is precisely the subject of our review.

16

Moreover, as will be discussed below, a claim for a breach of the good faith covenant requires that Chamberlain denied Trear the benefit of his contract. Consequently, a review of the panel's holding that Trear "was denied his right of refusal" necessarily encompasses the question of whether that denial emanated from a breach of the imbedded contractual covenant.

But even the majority's stated reason for declining to resolve the good faith covenant—that we do not have adequate district court factual findings—makes no sense to me. In my view, that rationale directly contradicts the standard of review that the majority says that it is applying. For ease of reference, I take the liberty of repeating the summary judgment paradigm recited by the majority, to-wit:

> """Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied.""" Slip op. at 6 (quoting *Armstrong v. Bromley Quarry & Asphalt, Inc.*, 305 Kan. 16, 24, 378 P.3d 1090 [2016]).

On summary judgment, the district court does not take evidence and make factual findings. Rather, it is to look at the record presented at that point, i.e., "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," and determine whether that record reveals any genuine issue as to a disputed material fact. 305 Kan. at 24. If so, the district court denies summary judgment; it does

17

not weigh evidence and assess credibility in order to resolve the factual conflict; that function is left for the trial. Instead, for summary judgment purposes, the district court is directed "to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought." 305 Kan. at 24. If the facts and inferences, viewed in the light most favorable to the opposing party, show that the opposing party will lose, as a matter of law, the movant gets summary judgment.

Applying those summary judgment rules to the case before us, the district court was not supposed to make a factual determination as to whether Chamberlain's initial offer price was "artificially high"; it was to decide if that fact was disputed. To be more precise, the district court was to decide whether an artificially high initial asking price was "material to the conclusive issues in the case" and, if so, whether Trear had "come forward with evidence to establish a dispute" as to whether the initial asking price was artificially high. 305 Kan. at 24. Therefore, I am unclear as to what the majority means by the "district court's factual findings on summary judgment," and why the lack thereof mandates remand. Slip op. at 13.

Perhaps the majority means that the district court must make the first determination as to whether there is no genuine issue as to any material fact and, by applying the rule against perpetuities rather than considering the merits, the district court did not make that determination. But if that determination is to be based on the record, then deference to the district court is not required. In other contexts, where the district court looks at a K.S.A. 60-1507 motion, files, and records, rather than conducting an evidentiary hearing, we have declared that "an appellate court is as equipped as a district court to decide the issues efficiently and reliably." *Laymon v. State*, 280 Kan. 430, 437, 122 P.3d 326 (2005); see also *Bellamy v. State*, 285 Kan. 346, 354, 172 P.3d 10 (2007) (no reason for appellate court to give any deference to district court's factual findings when appellate court has same access to the motion, records, and files as the district

court). More importantly, our own stated review standard declares that "[o]n appeal, we apply the same rules" as delineated for the district court. *Armstrong*, 305 Kan. at 24. It strikes me as pointless, other than to generate attorney fees, to remand for the district court to consider the summary judgment motion under the same rules that we would apply now and which we will apply when the case returns to us to review the remand decision.

In short, I would first hold that we have the procedural authority, if not the duty, to decide whether there is a basis upon which we can uphold the district court's grant of summary judgment to the defendants. Then, I would affirm the district court's grant of summary judgment for multiple reasons, none of which requires the resolution of the *defendants*' claim that Trear *also* had a good faith covenant that he breached, as the majority suggests is required for defendants to prevail. Rather, as a matter of law, Trear's response to the defendants' motion for summary judgment was insufficient to prevent summary judgment on the 1986 contract, as we have today interpreted that contract. Specifically, Trear failed to come forward with evidence to establish a dispute as to whether Chamberlain's initial asking price was artificially high; under our contract interpretation, an artificially high initial asking price was not material to the conclusive issues in the case; and our interpretation of the 1986 contract makes it legally impossible for Trear to obtain the relief he sought in his petition.

Trear's summary judgment response suggests that Chamberlain breached the good faith covenant by offering Trear the described adjoining real estate at an artificially high price and then a year later selling a portion of that land to others at a much lower price. But, in the words of our summary judgment review standard, Trear failed to "come forward with evidence to establish a dispute as to" the value of the described adjoining real estate. 305 Kan. at 24. As the majority recites, the district court specifically noted that Trear had not obtained an appraisal of the real estate. Moreover, Trear does not

contend that he would be qualified to testify as to the value of the real estate. While he points to the fact that the property did not sell after being listed with a real estate agent, he does not identify anyone who could opine that the reason the agent did not sell the property was because of an artificially high price. Our rules do not allow a party to avoid summary judgment with unsupported conclusory allegations.

On the other side of the ledger, Trear did not challenge Chamberlain's statement of uncontroverted fact that, in determining a sale price, she had gathered information from several sources. Likewise, it is undisputed that Chamberlain offered the land to Trear for a price that was *less* than it was listed with the real estate agent. Moreover, one could draw a reasonable inference that the $291,000 listing price was not artificially inflated from the fact that a real estate agent committed to invest his or her time and money into trying to sell the land at that price.

To the contrary, the Court of Appeals' pejorative declaration that Chamberlain first offered the entire tract to Trear for $289,000 and "then turned around and sold most of the property to Jasnoski and Goodell for 1/3 of that price," is the product of unwarranted and unfair speculation. As the majority points out, the 64-acre tract sold to Jasnoski and Goodell for $91,124 did not include Chamberlain's house. The unit price of $1,423.81 per acre could very well be within the fair market value range of such an unimproved tract; we do not know whether the acreage is prime Flint Hills pasture, residential development property, or overgrown wasteland. But obviously, that unit price would have no relationship to the remaining 9 acres containing the house in which Chamberlain lived (and perhaps other improvements), the value of which might well be in the $200,000 range. In other words, the panel's intimation that the subsequent sale price of an unimproved portion of the described adjoining land is proof of the unfairness of Chamberlain's initial asking price for the entire, improved land is unsupported by the

20

record before us. No reasonable inference may be drawn about the bona fides of the initial offer from the facts that we know about the subsequent sale.

Next, more fundamental than the evidentiary deficiencies, an artificially high initial asking price is not material to the conclusive issue of whether Chamberlain breached the good faith covenant. That "duty imposes both affirmative and negative obligations" and means that one party "will not intentionally and purposely do anything to prevent the other party from carrying out his [or her] part of the agreement, or do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Bonanza, Inc. v. McLean*, 242 Kan. 209, 222, 747 P.2d 792 (1987).

We are interpreting Trear's contractual benefit as his possessing the first opportunity to negotiate for the purchase of the described adjoining real estate at a price and on terms that are mutually agreeable. As the majority states, "Whatever was to happen was between Trear and Chamberlain." Slip op. at 10. Trear's benefit, then, was not to purchase the property at fair market value, but rather to be able to negotiate the price and terms. And as the majority asserts, "Trear undisputedly had the opportunity to negotiate with Chamberlain to purchase the real estate subject to the contract upon mutually acceptable price and terms when she approached him in 2013." Slip op. at 12.

Similarly, in order to carry out his part of the agreement, Trear had to negotiate the price and terms of the purchase with Chamberlain. He chose not to negotiate; the initial asking price, even if artificially high, is not what prevented Trear from performing his part of the agreement. Cf. *First Nat'l Bank of Omaha v. Centennial Park, LLC*, 48 Kan. App. 2d 714, 729-30, 303 P.3d 705 (2013) (bank's billing that stated a balance due more than owed did not hinder debtor's ability to perform under the contract and consequently did not breach implied covenant of good faith and fair dealing). Perhaps if Chamberlain

21

had refused to negotiate in good faith, Trear might have a colorable claim. But the good faith covenant did not require Chamberlain to set the initial asking price at the fair market value of the property. See *McLean*, 242 Kan. at 222 ("essential terms of a contract on which the minds of the parties have not met cannot be supplied by the implication of good faith and fair dealing").

Finally, I fail to understand how Trear can be granted the relief he seeks in his petition under our interpretation of the 1986 contract. He asked for the district court to void the deed to Jasnoski and Goodell on the 64 acres and to order that property be sold to him for the price Jasnoski and Goodell paid Chamberlain. The majority acknowledges that under the express terms of the 1986 contract, Trear's first right of negotiation had lapsed by the time the 64 acres was sold. But then the majority inscrutably adds "unless there is something to his good faith and fair dealing claim." Slip op. at 12. But the good faith covenant is imbedded in the Chamberlain/Trear contract; Jasnoski and Goodell were not parties to that contract; and the most liberal construction of Trear's petition does not disclose the legal basis upon which he purports to take land from Jasnoski and Goodell for Chamberlain's breach. In my view, summary judgment should function to terminate a case in which the plaintiff is legally precluded from getting the relief he or she seeks.

To channel Paul Simon, there must be 50 ways for Trear to lose this lawsuit. I would affirm the district court's grant of summary judgment to the defendants and end this debacle.

BEIER, J., joins in the foregoing concurring and dissenting opinion.

22